Durant Insulated Pipe Co. v. Commissioner.
Durant Insulated Pipe Co. v. Commissioner
Docket No. 7685.
United States Tax Court
1946 Tax Ct. Memo LEXIS 66; 5 T.C.M. (CCH) 905; T.C.M. (RIA) 46236; October 7, 1946
Leon A. Carley, Esq., 310 University Ave., Palo Alto, Calif., for the petitioner. A. James Hurley, Esq., for the respondent. MURDOCK Memorandum Findings of Fact and Opinion The Commissioner determined the following deficiencies against this petitioner: Declared
Value Excess-
Excess
Year
Income Tax
Profits Tax
Profits Tax
1940
$261.43
1941
74.43
1942
$151.29
$1,190.77 The only issue for decision is the amount of the basis (cost) to the petitioner of an exclusive license under a patent. Findings of Fact The petitioner is a corporation organized under the laws of California *67 on April 17, 1934. Its returns for the years here in question were filed with the collector of internal revenue for the first district of California. Its only business has been the manufacture and sale under a license, exclusive in the State of California, of a patented insulated pipe for underground use. Its manufacturing operations began in the spring of 1935 and have been continuous since that date. Albert A. Durant was the owner in the latter part of 1933 of U.S. Patent No. 1709844 dated April 23, 1929. The patent granted to him the exclusive right to make, use and vend an invention for insulating covering for conduit pipes. Durant entered into an agreement on December 23, 1933 with G. S. Miller, under which Durant granted to Miller the exclusive right to make, use and vend, in the State of California, the invention described in the patent, together with all improvements on the patent. Miller agreed to pay Durant royalties of five cents a foot and up, depending upon the size of the pipe manufactured and sold under the license. He also agreed to organize a corporation in California within one year after December 23, 1933. The corporation was to have a capitalization of not less *68 than $15,000 and was to be organized for the purpose of making, using and vending pipe under the license, which license was to be assigned to it by Miller. The royalties were to be paid directly to Durant by the corporation. The petitioner was organized. Miller offered to transfer all of his rights under his agreement with Durant to the petitioner in exchange for 2,500 shares of its capital stock, upon condition that the petitioner obtain from the Commissioner of Corporations of California authority to issue its shares in accordance with the offer. Miller also agreed to conform to and abide by all restrictions or conditions which might be imposed by the Commissioner of Corporations and agreed to by the petitioner. The petitioner accepted the offer on April 18, 1934. The petitioner's authorized capital stock consisted of 5,000 shares, each of the par value of $10. It applied to the Commissioner of Corporations of California for permission to issue 2,500 of its shares to Miller in exchange for his license under the agreement of December 23, 1933. The Commissioner granted the request subject to the following conditions: (1) the 2,500 shares for Miller were to be issued, not to him, *69 but to an escrow agent who would hold the shares in escrow pending the further written order of the Commissioner; (2) the owner of the shares should not sell or transfer them or any interest in them without the written consent of the Commissioner; (3) the first 1,000 shares to be issued to Miller were to be issued to him only as a like number of shares were sold for cash at par and the additional 1,500 shares were to be issued to him only when and as authorized by the Commissioner of Corporations; (4) Miller was to agree to waive his right to participate in any distribution of capital assets, as to the first 1,000 shares issued to him, until all other stockholders who paid cash for their shares had received the return of the full amount of the purchase price; (5) Miller agreed to waive all right to receive dividends on the 2,500 shares to be issued to him, while those shares were held in escrow, unless earlier released by the Commissioner, until the holders of all other shares had received dividends for the year in question at the rate of 6 per cent per share per annum; (6) the petitioner deposit at least $5,000 in cash on or before November 2, 1934 with a depositary approved by the *70 Commissioner of Corporations, provided that the date might be extended by the Commissioner upon such terms or conditions as he might prescribe; and (7) all authority to sell securities under the permit terminate on May 2, 1935, unless extended by the Commissioner. Only 85 shares of the petitioner's stock were sold for cash up to December 3, 1934, and 10 shares had been issued to Miller. An agreement was entered into at that time to which the petitioner, Miller, and A. H. Isenberg were parties. Isenberg therein subscribed for 500 shares of the petitioner's stock for $5,000 and Miller assigned to Isenberg the right to receive one-half of all shares to be issued to him in payment for the license after the first 500 shares. The petitioner agreed to issue shares in accordance with the subscription and the agreement. The same three parties entered into another agreement on January 9, 1937 reducing the total number of shares to be issued in exchange for the license from 2,500 to 1,600. The following table shows the number of shares issued by the petitioner or transferred up to the close of 1942. Shares
Shares
Shares
originally
transf'd
originally
issued in
from
issued
escrow in
stock-
for cash
payment
holder to
$10
for pat-
stock-
Year
per share
ent right
holder
1934
585
585
1935
200
200
10
1936
315
1937
405
720
25
1938
1939
250
95
5
1940
1941
10
1942
1,082 1/2
Total
1,755
1,600
1,132 1/2
*71 The consideration for all shares transferred from one stockholder to another was $10 per share. 1,050 of the shares transferred in 1942 were restricted shares issued originally to Miller. The stipulation of facts is incorporated herein by this reference. The cost to the petitioner, applicable to the years here in question, of the exclusive license in the State of California under U.S. Patent No. 1709844 was $4,500. Opinion MURDOCK, Judge: The only question for decision in this case is - what was the cost to the petitioner, applicable to the taxable years here in question, of its exclusive license to operate in California under the Durant patent. It is conceded that that cost will represent the petitioner's basis for deductions for depreciation and exhaustion of the patent under section 23(1), I.R.C. See sections 113 and 114. It is also conceded that this basis will be used in computing the excess profits credit based upon invested capital. The petitioner acquired the license from Miller by issuing its stock in exchange and by agreeing to pay the royalties directly to Durant. The royalties are deductible under another provision of the statute and do not *72 complicate the present controversy. The cost for present purposes was the fair market value of the shares of stock issued in exchange for the license at the times issued. The petitioner originally agreed to issue 2,500 shares to Miller, but the number was subsequently reduced to 1,600. Both parties agree that 1,600 shares were issued in exchange for the license, despite the fact that 550 of them apparently went, not to Miller, but to Isenberg as an inducement to move him to subscribe $5,000 in cash for 500 of the regular shares of the petitioner. The shares were not to be issued all at once but at indefinite future times. The question thus presented is - what was the value of those 1,600 shares at the times they were issued. The petitioner has taken the position that the shares were of the same value at all times material hereto. That value, it contends, was the par value of $10 per share. It arrives in this way at $16,000 as the cost of the license. It makes no distinction between the value of the shares sold for cash and the value of 1,600 shares issued for the license, although it recognizes, as indeed it must, that the latter shares were subject to a number of restrictions to *73 which the other shares were not subject. Isenberg, the President and Treasurer of the petitioner, who has been active in its affairs since December 1934, testified that the fair market value of the license on April 18, 1934 was $25,000 and the fair market value on that date of the right to receive 1,600 shares of the stock was $16,000. He was asked what facts he took into consideration in arriving at those values. He replied that the Durant insulated pipe was an outstanding improvement over anything that had been manufactured before and there was only one real competitor in the field. He recognized that it would take perhaps three years to develop a profitable market for the pipe, during which time estimated losses would amount to about $5,000 a year, but he stated there was available capital from outside persons which was not difficult to get for the purpose of this development. He thought the business had great possibilities from the very beginning which only needed to be developed. He did not explain how he reduced these general opinions of his to a dollar value, either for the stock or for the license. It was developed on cross-examination that he had given his opinion previously *74 that the restricted shares had no value in 1937. We have endeavored to give his opinion such weight as it is entitled to under all of the evidence in the record. The record does not show whether or not similar pipe was ever manufactured and sold by others under the patent prior to the valuation date or dates here in question. Miller acquired the license in December 1933 at no cost above the royalties. Some of the unrestricted shares of the stock of the petitioner were sold from time to time at par. Also, Isenberg bought Miller's restricted shares at par in 1942. A transaction involving some of the shares here in question, at a date material hereto, was that of December 3, 1934. The agreement itself is not in evidence, but the parties have stipulated that the agreement was entered into and under it Isenberg subscribed for 500 shares of regular stock for cash and Miller assigned to Isenberg one-half of all shares to be issued to him in payment for the license after the first 500 shares. This we may properly assume was an arm's length transaction in which all parties were dealing for their own best interests. It shows that Isenberg, by paying $5,000 in cash to the petitioner, was able *75 to acquire 500 of its regular shares, plus a right to receive one-half of whatever shares Miller was to receive in exchange for the license in excess of 500. Miller received no cash for what he surrendered. His benefit was apparently to come indirectly through saving the corporation and adding value to his remaining shares. It appeared at that time that Isenberg might receive one-half of 2,000, or 1,000 shares. The number was cut down about two years later to 550. The agreement of December 3, 1934 would thus indicate that 500 regular shares, plus the right to receive one-half of the remaining restricted shares to be issued to Miller, was worth about $5,000. It would also indicate that the right to receive one-half of the remaining restricted shares to be issued to Miller was not alone worth $5,000. The value of the unrestricted shares would appear to be greater than the value of the restricted shares. Thus, this transaction would indicate that the right to receive one-half of the remaining restricted shares was worth less than one-half of $5,000, probably substantially less. This evidence has been given careful consideration. There is also in the record some evidence of the actual *76 losses and earnings of the petitioner, which evidence indicates that Isenberg was a little too optimistic. The petitioner sustained operating losses right up to the period here in question and it had no substantial profits until 1942. Its total sales for the first several years average about $13,500. They increased to an average of a little over $31,000 for the three years ending with 1941, and then they jumped to $343,974.21 for 1942. The record does not show whether or not the war had anything to do with this last tremendous increase. The life of the patent was only twelve years when the petitioner first acquired the license. We conclude that the stock issued for this license was worth some substantial amount and the Commissioner erred in holding that its value was zero. On the other hand, the evidence falls far short of supporting the petitioner's contention that the cost was $16,000. The restricted shares issued in exchange for the license were not worth par at the dates issued. We have endeavored to find some cost. Cf. Cohan v. Commissioner, 39 Fed. (2d) 540. Our finding of cost has been made in the light of all of the evidence in the case. Decision will be entered *77 under Rule 50.